## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

LAWRENCE GOODMAN
207 Prettyman Drive
Rockville, Maryland 20850
Montgomery County

Civil Action No.: _____ —

v.

**COMPLAINT**

GOODMAN GABLE GOULD ADJUSTERS INTERNATIONAL, INC.
10110 Molecular Drive
Suite 300
Rockville, Maryland 20850
Montgomery County

NAYLORS OFFICE PROPERTY VENTURE, LLC
6 Reservoir Circle, Suite 202
Baltimore, Maryland 21208
Baltimore County

Harvey M. Goodman, in his capacity as Managing Member of
NAYLORS OFFICE PROPERTY VENTURE, LLC
6 Reservoir Circle, Suite 202
Baltimore, Maryland 21208
Baltimore County

## **COMPLAINT**

Plaintiff Lawrence Goodman ("Goodman" or "Plaintiff), for his complaint against Defendant Goodman Gable Gould Adjusters International, Inc. ("GGG" or "Defendant GGG"), Naylors Office Property Venture. LLC ("NOPV" or "Defendant NOPV"), and Harvey M. Goodman in his capacity as Manager of NOPV, through undersigned counsel, states as follows:

## Parties

1.      Plaintiff is an individual residing at 207 Prettyman Drive, Rockville, Maryland.

2.      Defendant GGG is a Maryland Corporation with offices at 10110 Molecular Drive, Suite 300, Rockville, Maryland. ("the Rockville Office").  Defendant GGG also has offices in Baltimore, Maryland (the "Baltimore Office").

3.      Defendant NOPV is a Maryland limited liability company.

4.      Harvey M. Goodman ("Harvey Goodman") is the President and Chief Executive Officer of Defendant GGG.  Harvey Goodman is also a Member of, the Manager of, and owner of 20% of Defendant NOPV.

5.      Neil Kahn ("Kahn") is Executive Vice President and General Counsel of Defendant GGG. Kahn is also owner of 4% of NOPV.

6.      Barry Flax ("Flax") is an Executive Vice President and National Loss Coordinator for Defendant GGG.  He was also from time to time Plaintiff's supervisor.  Flax is also the owner of 4% of NOPV.

7.      Jim Harper ("Harper") is an Executive Vice President of Defendant GGG. Harper was one of Plaintiff's supervisors and was in charge of assigning "losses" to Defendant GGG's Adjusters.  Harper is also the owner of 8% of NOPV.

**Jurisdiction and Venue**

8.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 as the matter involves federal questions of age discrimination, disability discrimination and

retaliation.

9.     This Court has jurisdiction over the Maryland State Law claims pursuant to 28

U.S.C. §1367(a)

10.     This Court also has personal jurisdiction because the Defendants regularly

conduct business in Maryland.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), as Defendants have

offices, conduct business and have substantial business contacts within this District, and the

causes of action all arose in this District.

12.     Plaintiff has exhausted all administrative remedies and complied with all

conditions precedent to bringing this action and all claims asserted herein.

13.     This action has been brought within all applicable statutory deadlines and statutes

of limitations.

**Facts Common to All Counts**

14.     Defendant GGG is an insurance adjusting company.  Defendant GGG's business

model is to identify fires, floods and other disasters where property owners experience a loss that

will be reported to the property owners' insurance company (the "carrier").  Defendant GGG

then contracts with property owners (insured home or business owners, hereinafter "insureds") to

pay Defendant GGG anywhere from 7% to 10% of the payout that an insured may receive if his

or her carrier pays a claim.  In exchange, Defendant GGG evaluates a loss and assists the insured

in negotiating with his or her carrier to maximize the insured's payout.

15.     Defendant GGG identifies losses in numerous ways, including referrals, call-ins, and monitoring fire and police communications and local TV/radio stations that may report on property losses or damage.

16.     Defendant GGG employs individuals in the position of "adjuster."  An adjuster's responsibilities include going to loss sites after Defendant GGG learns of property damaged by fire, flood or natural disaster, evaluating the extent of the damage to the property and advising the owner/insured about the amount of a claim to be made to the insurance carrier.  The adjuster then helps the owner/insured negotiate with his/her insurance carrier to get the most advantageous insurance coverage settlement.

17.     Insurance adjusting is a unique specialty where the adjuster assists a client, who has often suffered from lost or damaged property, obtain the best possible settlement from the client's insurance carrier.  Becoming an expert adjuster can take years as one must learn the ins and outs of insurance policies, coverage issues and the numerous ways a client may be entitled to insurance coverage under his or her policy.

18.     Plaintiff began working for Defendant GGG in the late 1970s when he was in his 20s.  He began his career as a junior employee doing some soliciting, adjusting and inventory work.  As his career progressed, he became an expert insurance adjuster.

19.     Plaintiff primarily worked out of Defendant GGG's Rockville offices where he had a private office.

### Plaintiff's Disability

20.     During his time working at Defendant GGG, Plaintiff also suffered from a disability, epilepsy.   From time to time Plaintiff would suffer from seizures.  When suffering from a seizure, Plaintiff suffered substantial limitations in major life activities such as standing,

walking, speaking and thinking.  With the exception of the times when he suffered from seizures, however, his disability did not affect Plaintiff's ability to function as an effective insurance adjuster and otherwise fulfill his employment duties.

21.     Plaintiff's disability was well known throughout the Defendant GGG's Rockville office.  Plaintiff's supervisors, including Harvey Goodman and Kahn were also well aware the Plaintiff had epilepsy and that he experienced seizures from working and travelling with Plaintiff for so many years.

22.     As a result of the seizures, some employees in Defendant GGG's offices did not want to work with Plaintiff.  Defendant GGG discriminated against and ultimately terminated Plaintiff as a result of his disability.

<u>**Plaintiff's Work History**</u>

23.     Plaintiff worked with Defendant GGG for more than 39 years until he was terminated at the age of 63 by Harvey Goodman and Kahn in February 2018.

24.     During his more than 39 years of employment with Defendant GGG, Plaintiff participated in adjusting hundreds of losses for Defendant GGG's clients.  These included a role in adjusting some of Defendant GGG's largest losses, including a $40,666,000 recovery at Boca Raton's Century Village and a $8,952,000 recovery at Pines of Delray North in Florida after Hurricane Wilma.  On information and belief, these losses alone generated millions of dollars in commissions and fees for Defendant GGG.

25.     Plaintiff was publicly known as an outstanding insurance adjuster.  Defendant GGG marketed its insurance adjusting services to the public in part based on Plaintiff's past work and expertise.

26.     For years before and even after Defendant GGG terminated Plaintiff in February 2018, Defendant GGG continuously produced and publicly distributed marketing material containing the names of satisfied clients who had used their insurance adjusting services.  Those marketing materials contained the names of many clients whose claims were adjusted by Plaintiff and who were willing to recommend that others hire Defendant GGG and specifically use Plaintiff to adjust their claims.   Clients named in Defendant GGG's publicly distributed marketing materials highly recommended Plaintiff because of his expertise in adjusting and cited positive results that he obtained for them in settlements with their insurance carriers. Marketing materials touting recommendations from clients whose cases were adjusted by Plaintiff are attached hereto as Exhibit 1.

27.     Affidavits from two of Defendant GGG's clients who are named in Defendant GGG's marketing materials attesting to the quality of Plaintiff's adjusting abilities are attached hereto as Exhibits 2 and 3.

## **Plaintiff's Compensation**

28.     As an adjuster, Plaintiff earned a base salary and was eligible to earn bonuses and a share of the company's profits based on the financial performance of Defendant GGG and his personal contribution to that performance.  The amounts of the bonuses/profit sharing were determined by Plaintiff's supervisors, including Harvey Goodman, Kahn, Harper and Flax.

29.     Plaintiff also received a car allowance and health benefits while he worked at Defendant GGG.

30.     Defendant GGG also paid as employment benefits certain other of the Plaintiff's work expenses such as his cell phone bill, adjuster's license fees and monthly gas expenses.

31.     Because Plaintiff was Harvey Goodman's cousin and a member of the Goodman family, Plaintiff was given shares of stock of Molecular Holding Company ("MHC").   MHC is a holding company created by Harvey Goodman to be the owner of the shares of GGG.  On information and belief, MHC was created to shield and protect GGG's shares from claims by creditors and others.  Others at Defendant GGG, including Harvey Goodman, owned shares of MHC.   Plaintiff was also a member of Defendant GGG's Board of Directors.

## The Hostile Work Environment At Defendant GGG

32.     The work environment at Defendant GGG was demanding.  Adjusters were required to be on-call 24 hours a day -- including weekends -- to make sure there was always someone available to respond to losses.  The adjusting position was also difficult because there are multiple obstacles to signing a loss.  Emergency first responders or law enforcement are often at the scene when Defendant GGG's adjusters arrive to evaluate and sign a loss.  Defendant GGG instructed its adjusters to try to work around firemen and police officers to contact insureds on site, if possible.

33.     Defendant GGG and its officers -- including Harvey Goodman, Kahn, Harper and Flax -- maintained and tolerated a hostile work environment which was rife with harassment.  At least one key supervisory employee, Flax, had a practice of internally disparaging others by name-calling and belittling others' appearance and intellectual capacity.   When speaking about Defendant GGG's employees whom he supervised, including Plaintiff, Flax used words like "idiot" and other slurs to belittle and demean these employees.

34.     The hostile employment practices of Defendant GGG and Flax were from time to time directed at Plaintiff.   For example, on November 4, 2015, Flax wrote an email to Kahn

about the Plaintiff in which he expressed his opinion that the Plaintiff should be fired and using a

slur to describe Plaintiff's intellectual capacity to Kahn:

> "**The idiot was in here today. LG [Lawrence Goodman].** Elaine and Ojana were in a
> panic about LG yelling at Elaine…. TIME FOR HIM TO BE GONE GONE GONE
> GONE in my opinion."

*See* Exhibit 4, attached (emphasis added).

35.     There was no deficit in Plaintiff's intellectual capacity, and Plaintiff was well

known to be an excellent adjuster, but Flax did not like the fact that Plaintiff suffered seizures

from time to time and belittled him because of this disability.  Flax was permitted to make such

incendiary and insulting statements about Plaintiff and other employees without discipline from

management because Defendant GGG tolerated a hostile work environment.  Name calling,

yelling at subordinates and belittling of others' skills, among other hostile and threatening

behaviors, were commonplace in Defendant's GGG Rockville office. Harvey Goodman, Kahn

and Harper all knew about, tolerated and participated in this behavior.

36.     The hostile work environment is significant because in such a work environment,

decisions are made arbitrarily and based on factors such as an employee's age or because of a

disability that makes him/her different from other non-disabled employees.

### Plaintiff Suffers From A Stroke And Defendant GGG Discriminates Against Him And Schemes To Acquire His MHC Stock

37.     In approximately October 2015, Plaintiff suffered a minor stroke and was required

to miss approximately one week of work.  At the time this occurred, Plaintiff was approximately

60 years old.

38.     While Plaintiff was out of the office recovering from his stroke, Defendant GGG,

Harvey Goodman and others known and unknown to Plaintiff began plotting a scheme to acquire

Plaintiff's MHC stock and remove him from the Board of Defendant GGG.

39.     In March 2016, Plaintiff was called into a meeting with Harvey Goodman and Kahn, at which they presented Plaintiff with a document titled Memorandum of Understanding (the "MOU").  *See* Exhibit 5, attached.

40.     The terms of the MOU provided that Plaintiff would be required to surrender his MHC stock in exchange for certain other benefits.  Defendant GGG, Harvey Goodman and Kahn did not give Plaintiff an opportunity to have the value of his stock professionally appraised before signing the MOU.

41.     The MOU further provided: "Whereby, for the agreements made herein, and other adequate consideration, it is agreed that LG [Plaintiff] and GGG [Defendant] agree to resolve all outstanding issues based upon the following agreements…."

42.     Among the agreements listed in the MOU was that Plaintiff would transfer his MHC shares to Defendant GGG.  In exchange, Defendant GGG would transfer to Plaintiff a life insurance policy ("the Policy"), and Defendant GGG agreed to pay one half of the Policy's premiums for 10 years beginning in the fall of 2016.  *See* Exhibit 5 at ¶¶ 1 and 2.

43.     The MOU further provided that: "[Defendant] GGG will continue to employ [Plaintiff] for a period of no less than 5 years at a salary and compensation package which is substantially equivalent to that currently in place.  As part of the compensation GGG will continue to provide payments to defray the cost of an automobile, and will continue to include [Plaintiff] for consideration in its bonus program on an annual basis in good faith…." *Id. at* ¶ 4.

44.     Harvey Goodman and the Plaintiff signed the MOU on March 28, 2016.

45.     The language in the MOU concerning Defendant GGG's obligation to employ Plaintiff for five years beginning March 28, 2016 was unambiguous and unconditional.  The MOU contained no performance requirements for Plaintiff and there were no exceptions

permitting Defendant GGG to avoid its obligations to employ and pay Plaintiff the agreed upon salary and benefits for the term of the agreement.

46.     As part of these negotiations, Plaintiff also agreed to give up his seat on the Board of Defendant GGG as part of the agreement.

### Defendant GGG Discriminates Against Plaintiff And Breaches The MOU

47.     Not long after the execution of the MOU, Defendant GGG's discrimination against the Plaintiff intensified.  The discrimination took several forms including reducing the number of losses assigned to Plaintiff and retaliating against him for reporting the discrimination to Defendant GGG's management.

48.     In October 2016 Plaintiff noticed that his supervisors -- including Harper -- were not assigning losses to him, and Plaintiff concluded that his supervisors were discriminating against him because of his disability and his age.  Adjusters such as Plaintiff wanted losses assigned to them because successful handling of those losses would be considered at year end when Defendant GGG's management calculated the adjusters' discretionary bonuses.  It was Plaintiff's handling of these assigned losses that Defendant GGG had agreed to consider in good faith in paying annual bonuses to Plaintiff.  If Defendant GGG did not assign losses to Plaintiff he would be less likely to earn an annual bonus.

49.     Plaintiff met with Harvey Goodman, Kahn and Harper and expressed his concerns.  At the meeting Plaintiff was told that Defendant GGG would not assign him additional losses because of his seizures.  Plaintiff stated that he was perfectly able to perform his job duties effectively and wanted losses assigned to him.

50.     In November 2016, Plaintiff again complained to Kahn that Harper was not fairly assigning losses to him.  He cited two losses where he had been recommended but which Harper had assigned to other adjusters.

51.     Following Plaintiff's complaint to Kahn, Harper communicated with Kahn and acknowledged that he was limiting the number of losses assigned to Plaintiff – just as Plaintiff suspected.  On information and belief, Harper discriminated against Plaintiff because of his disability and his age.  Harper and Defendant GGG also breached the MOU by failing to assign losses to Plaintiff in good faith.

52.     At the time these discussions took place in the fall/winter of 2016, Defendant GGG had no formal or operative Human Resources ("HR") infrastructure.  There was no formal HR director; there were no annual employee reviews; there was no confidential reporting hotline; the GGG "Employee Handbook" had not been updated for more than 13 years and was just a form manual that was not implemented in practice.

53.     Left without other reasonable alternatives, Plaintiff met with Mariah Poole, who was the Rockville office manager and whom he believed to be the only management employee with responsibility for HR matters who was not directly involved in the discrimination against him.  Kahn and Harvey Goodman, who were both involved in the discrimination against Plaintiff, were the only officers with official HR roles in addition to their other responsibilities with the company.

54.     Plaintiff told Poole "'they are not giving me any new losses and you are Human Resources here.'"  He went on to state that "'I have a disability and I'm reporting it to you.'"

55.     On December 8, 2016, Poole promptly emailed Kahn to memorialize the

Plaintiff's report of discrimination.  *See* Exhibit 6, attached.  In that email, Poole recounted the

conversation as follows:

> [Poole]: "'Lawrence what are you doing? As your friend, I recommend you do not
> go there. You have been part of GGG for many years. GGG has been there for
> you for many years. Doing this is going to hurt you.' [Plaintiff]: '[B]ut they are
> not assigning me any new losses.' [Poole]: 'Why don't you do the best you can
> with the losses you have? If someone wanted to stop giving me new work – I'd be
> happy if they were still paying me. How old are you? Aren't you getting close to
> retirement? Wouldn't you like to retire?' [Plaintiff]: 'I'm 62, I don't want to
> retire, maybe I would if I was 72, but not now.'"

56.     Poole thus admitted that she not only tried to discourage the Plaintiff from

reporting the discriminatory behavior up the chain of command – suggesting instead that he "be

happy" that they were "still paying [him]" – but she also asked him if he wanted to "retire"

because of his age.

57.     In response to Poole's email Kahn emailed Plaintiff telling him, in essence, that

his only recourse was to report issues to Kahn, Harper or Harvey Goodman – all of whom

Plaintiff believed to be participating in the discrimination against him.

**Plaintiff Again Reports Discrimination and Harassment and Defendant GGG Retaliates**

58.     Shortly thereafter, Defendant GGG's harassment of Plaintiff accelerated.  In

January 2018, for example, Defendant GGG claimed that Plaintiff was overheard having loud

and aggressive conversations while on the phone in his private office, and that he later tried to

engage another employee of Defendant GGG into a conversation about whether he was too loud.

59.     Several hours later Plaintiff suffered a significant nosebleed in the office, which

he attended to in the kitchen, and which resulted in him getting blood on his shirt and the floor.

60.     After this incident Kahn emailed Plaintiff and directed him to obtain a doctor's note stating that he was fit for duty before coming back to work, so that the Defendant GGG "could ensure that this type of incident would not happen again."

61.     Plaintiff responded to Kahn by noting that the requirement that he obtain a doctor's note pronouncing him fit for work was a requirement applicable only to Plaintiff and not to other employees and that it amounted to retaliation arising from Plaintiff's disability.  *See* Exhibit 7, attached.

## Defendant GGG Terminates Plaintiff Less Than Two Weeks After His Health Episode

62.     On February 7, 2018, Defendant GGG called Plaintiff to a meeting at Defendant GGG's Rockville office.  The impetus of the meeting was Plaintiff's complaint that Kahn was harassing him and retaliating against him by demanding that Plaintiff produce a doctor's note before returning to work.

63.     Harvey Goodman and Kahn met with Plaintiff and Plaintiff's attorney on February 7, 2018.

64.     At the meeting, Kahn first informed Plaintiff that Defendant GGG believed it had grounds to terminate Plaintiff.  Kahn stated that Plaintiff had been involved in a loud and aggressive telephone conversation while in his office.

65.     Kahn further told Plaintiff that Defendant GGG was asking for his resignation effective immediately.  Kahn told Plaintiff that it was his last day in the office and that he could not return to the office to say goodbye to other employees or even collect his belongings.

66.     Kahn read a prepared statement to Plaintiff stating that if Plaintiff resigned as instructed, he would receive some compensation, but also he would be required to sign a full

release of all claims against Defendant GGG and its officers and affiliates including release of claims for disability discrimination, age discrimination and retaliation.

67.     Plaintiff's counsel asked Kahn to describe the bases for GGG's contention that Plaintiff was not satisfying his employer's expectations and that it had grounds to terminate him. Kahn did not, or was unable to, provide any specific examples other than quoting the purported incident of the Plaintiff allegedly using an unreasonably loud voice when taking a private telephone call in his office.

68.     Plaintiff's counsel also asked Kahn for a copy of the statement he had read.  Kahn refused to provide Plaintiff and his counsel a copy of the statement.

69.     After hearing Kahn's remarks, and particularly the restrictions that would be placed on him if he did not resign, Plaintiff reasonably believed that he had been fired.

70.     Defendant GGG willfully and intentionally severely restricted the aspects and conditions of Plaintiff's continued employment for the purpose of forcing Plaintiff to quit.

71.     The conditions to be imposed by Defendant GGG if Plaintiff refused to resign were so intolerable, severe and burdensome that any reasonable person would have believed that they had been terminated.

72.     On the next day, February 8, 2018, Defendant GGG suddenly withdrew its demand that Plaintiff resign, and instead explicitly terminated Plaintiff by sending a termination letter to Plaintiff's counsel.  Defendant GGG has since falsely claimed that it terminated Plaintiff on February 8, 2018, in part, because he allegedly tried to "misappropriate" a client recovery check from Traveler's Insurance Company.   These claims are pretextual.

73.     Defendant GGG's adverse employment actions took place within two weeks of a significant health episode – Plaintiff's nosebleed in the kitchen.  Defendant GGG clearly

intended to bar Plaintiff from the office so other employees would not experience the adverse physical effects of Plaintiff's disabilities including seizures.

74.     During the period when Defendant GGG discriminated against Plaintiff and after Plaintiff's termination, Harper assigned losses to other younger adjusters at Defendant GGG including, Zachary Forrest, Evan Harris and Stephen Harper.  All of these employees were less than 40 years of age.

75.     On August 1, 2018, Plaintiff filed a complaint with the EEOC alleging that his termination was the result of Defendant GGG's Disability Discrimination, Age Discrimination and Retaliation for his reporting unlawful discrimination.

76.     On October 29, 2019, the EEOC provided Plaintiff with a Notice of Right to Sue letter and this lawsuit followed. (*See* Notice of Right to Sue, attached as Exhibit. 8).

**<u>Naylors Office Property Venture As It Relates to Plaintiff's Termination</u>**

77.     NOPV is an LLC formed in February 2011 to own and operate on office building that housed Defendant GGG's Baltimore office.  NOPV also made investments in other commercial properties.  At the time of its formation in 2011 NOPV had 12 investors including Harvey Goodman who invested $100,000 for his 20% interest in NOPV, and is the Manager of the NOPV.

78.     Plaintiff invested $40,000 for his 8% interest in NOPV, and Kahn invested $20,000 for his 4% interest in NOPV.

79.     Under the terms of its Operating Agreement, NOPV has the option to repurchase the interest of any investor who was not also employed by Defendant GGG. The option is exercisable at a set price comprised of the value of the investor's capital contribution plus a small amount of interest.

80.     On or about August 21, 2018, Harvey Goodman, in his capacity as Manager of

NOPV sent Plaintiff a letter stating that NOPV was exercising its right and option to repurchase

Plaintiff's NOPV interest as a result of his termination from GGG.  The letter included a check

for $55,845 that, according to the letter, represented return of Plaintiff's capital contribution plus

interest.  The letter also stated that as of August 31, 2018, Plaintiff would no longer "participate

in any Net Income, Net Loss or any distribution of cash or assets of the company."

81.     Plaintiff did not cash the check because he believed that the actions of NOPV and

Harvey Goodman were a breach of their fiduciary duties of loyalty and reasonable care to him

and resulted in the unjust enrichment of NOPV and its remaining Members.  Specifically,

Plaintiff believes and therefore alleges that he was terminated from Defendant GGG in part to

permit NOPV to repurchase his interest at a less than fair market price.

## FIRST CLAIM FOR RELIEF
### Breach of Contract
### (Defendant GGG)

82.     Plaintiff hereby adopts all aforesaid paragraphs as if fully set forth herein.

83.     As evidenced by the MOU dated March 26, 2016, Defendant GGG entered into a

binding written contract with Plaintiff.

84.     The parties exchanged valuable consideration in connection with the written

agreement. Plaintiff fulfilled his obligations under the MOU by transferring his Molecular

Holdings Corp stock to Defendant GGG.

85.     Defendant GGG materially breached the terms and conditions of the MOU in

February 2018 by terminating Plaintiff from his job with Defendant GGG.

86.     Defendant also breached the MOU by failing for a period of no less five years

from the date of the MOU to: i) pay Plaintiff a salary a compensation package equivalent to his

compensation as of March 26, 2016, ii) make payments to defray the cost of his automobile; iii)

consider Plaintiff for payments under its bonus program on an annual basis in good faith; and iv) pay one-half the cost of the premiums for the Life Insurance policy transferred by Defendant GGG to Plaintiff as part of the MOU.

87.     Plaintiff made numerous attempts in writing to get Defendant GGG to cure the breach and default.  Defendants have failed and refused to cure their breach and default. Plaintiff has sustained damages as a result of Defendant GGG's breach of contract.

**WHEREFORE**, Plaintiff prays this Court for the following relief against Defendant GGG:

1) For the 38-month period between February 2018 and March 2021, pay Plaintiff a) a salary and a compensation package equivalent to his compensation as of March 26, 2016; b) an amount sufficient to defray the cost of his automobile; and c) an amount equal to the bonuses he would have received had Defendant not breached its agreement with Plaintiff;

2) For the period of 9 years from February 2018, pay Plaintiff  one half the cost of premiums for the life insurance policy transferred to Plaintiff as part of the consideration for the MOU;

3) Return to Plaintiff his 8% share of the NOPV that was wrongfully taken from his as a result of Defendant GGG's breach of the MOU;

4) Award Plaintiff reasonable attorney's fees;

5) Award Plaintiff prejudgment interest; and

6) Award Plaintiff such other relief as the Court deems appropriate.

## SECOND CLAIM FOR RELIEF
**Disability Discrimination**
**(The Americans With Disabilities Act) ("ADA")**
**(42 U.S.C. § 12101 *et. seq.*, as amended)**
**(Defendant GGG)**

88.     Plaintiff hereby adopts and incorporates all aforesaid paragraphs as if fully set forth herein.

89.     Plaintiff has a disability as defined by the Act.

90.     Plaintiff was also regarded as having a disability as defined by the Act.

91.     Defendant had notice of Plaintiff's disability.

92.     Plaintiff has a record of having a disability.

93.     Plaintiff could perform the essential functions of his job with a reasonable accommodation.

94.     Plaintiff's disability did not preclude the performance of his essential employment responsibilities.

95.     Defendant GGG altered the terms and conditions of Plaintiff's employment because of Plaintiff's disability.

96.     Defendant GGG took adverse actions against Plaintiff because of Plaintiff's disability.

97.     Defendant GGG discrimination was willful and malicious.

98.     Plaintiff exhausted his administrative remedies prior to filing this suit.

99.     Plaintiff has suffered and continues to suffer substantial pecuniary and non-pecuniary damages, as well as severe stress, anxiety and depression and other mental and physical anguish as a result of Defendant GGG's actions.

**WHEREFORE**, Plaintiff prays this Court for the following relief against Defendant:

1) Reinstatement to an appropriate job position;

2) Actual, compensatory, liquidated and or punitive damages, as provided under applicable law;

3) The costs and fees of this action, including reasonable attorney's fees;

4) Pre-judgment and post-judgment interest as allowed by law;

5) Any further relief that this Court deems just and appropriate.


### THIRD CLAIM FOR RELIEF
**RETALIATION (THE "ADA")**
**42 U.S.C. § 12203(a)**
**(Defendant GGG)**

100.    Plaintiff hereby adopts and incorporates all aforesaid paragraphs as if fully set forth herein.

101.    Plaintiff engaged in protected activity by reporting discriminatory employment practices to Plaintiff's supervisor, Defendant's HR department, the EEOC and others.

102.    Defendant and Defendant's agents were aware of Plaintiff's protected activity.

103.    Defendant GGG retaliated against Plaintiff because of Plaintiff's protected complaints about unlawful disability discrimination.

104.    Plaintiff has suffered adverse actions because of his protected activity.

105.    There is a causal connection between Plaintiff's protected activity and the adverse employment actions taken by Defendant against Plaintiff.

106.    Plaintiff exhausted his administrative remedies prior to filing this suit.

107.    Defendant's actions were willful and malicious.

108.    Plaintiff has suffered and continues to suffer substantial pecuniary and non-

pecuniary damages, as well as severe stress, anxiety and depression and other mental and physical anguish as a result of Defendant GGG's actions.

**WHEREFORE**, Plaintiff prays this Court for the following relief against Defendant:

1) Reinstatement to an appropriate job position;

2) Actual, compensatory, liquidated and or punitive damages, as provided under applicable law;

3) The costs and fees of this action, including reasonable attorney's fees;

4) Pre-judgment and post-judgment interest as allowed by law;

5) Any further relief that this Court deems just and appropriate.

## FOURTH CLAIM FOR RELIEF
### (Violation of the Age Discrimination in Employment Act ("ADEA")
### (29 U.S.C. § 626(b) *et seq.*)
### (Defendant GGG)

109.    Plaintiff hereby adopts and incorporates all aforesaid paragraphs as if fully set forth herein.

110.    At the time of his discharge Plaintiff was a member of protected class in that he was older than 40 years of age.

111.    At the time of his discharge, Plaintiff was performing his duties at a level that met Defendant GGG's legitimate expectations.

112.    Other employees of the Defendants were performing similar duties at a similar level and were not demoted or terminated.

113.    After Plaintiff was terminated in February 2018 he was replaced by an employee who was younger than 40 years in age.

114.    Defendant discriminated against Plaintiff because of his age.

115.    As a result of Defendant GGG's discrimination against Plaintiff because of his

age, Plaintiff suffered adverse employment actions including, but not limited to, deprivation of the opportunity to earn bonuses, loss of salary, loss of car allowance, loss of other benefits and eventually termination.

116.    The practices complained of in the Complaint deprived Plaintiff of equal employment opportunities and otherwise adversely affected his employment status because of his age.

117.    Plaintiff was damaged by Defendant's unlawful actions.

**WHEREFORE**, Plaintiff prays this Court for the following relief against Defendant:

1)    Reinstatement to an appropriate job position;

2)    Actual, compensatory, liquidated and or punitive damages, as provided under applicable law;

3)    The costs and fees of this action, including reasonable attorney's fees;

4)    Pre-judgment and post-judgment interest as allowed by law;

5)    Any further relief that this Court deems just and  appropriate.

## <u>FIFTH CLAIM FOR RELIEF</u>

**Breach of Fiduciary Duties of Loyalty and Reasonable Care**
**(Defendant NOPV and Harvey M. Goodman, Manager of NOPV)**

118.    Plaintiff hereby adopts and incorporate all preceding paragraphs as though full set forth herein.

119.    Defendant NOPV is a Maryland Limited Liability Company.

120.    Defendant NOPV has two classes of Members: Class A and Class B. The Class A Members are Harvey M. Goodman and the Misty-CODA Family LLC.  The Class B Members are Randy Goodman, Karl Denison, Laurie Stein, Jim Harper, Barry Flax, Tony D'Amico, Hayes

Walker, Neil Kahn, Andy Gorelick, Jim Twadell and Plaintiff.

121. Harvey Goodman was CEO of Defendant GGG.

122. Both the Class A and Class B Members of NOPV made capital contributions to NOPV and received Units of NOPV to evidence their ownership of the entity.

123. Harvey Goodman was the Manager of NOPV.

124. Pursuant to Article V, Section 5.2 of the NOPV Operating Agreement, "All decisions and determinations affecting the conduct of the affairs of [NOPV] shall be made by the manager."

125. As Class A Member and Manager of NOPV, Harvey Goodman was an agent of NOPV and owed fiduciary duties of loyalty and reasonable care to NOPV's other Members, including Plaintiff.

126. The Operating Agreement of NOPV provided at Section 6.5 (a) and (b) that if any Member's employment with GGG terminates within 10 years of the Effective Date of the Operating Agreement, *i.e.* February 2011, then NOPV has the "right and option to purchase the entire Percentage Interest of such Class B Member in the Company." Section 6.5 further provides in subsection (d) that the "Withdrawn member's Percentage Interest shall be re-purchased for a purchase price equal to such Withdrawn Member's total capital contribution for each year during which such Withdrawn Member was a Class B Member of the Company, determined by the Company's accountants as of the date of such Withdrawn Member's Withdrawal."

127. The amount of the repurchase price provided for in Section 6.5 was substantially below the actual value of the NOPV Membership Units.

128.     As Member and Manager of NOPV and CEO of Defendant GGG, Harvey
Goodman knew that if GGG terminated Plaintiff, NOPV would have the right and option to
repurchase Plaintiff's 8% of NOPV's Units at the below actual value and that this would benefit
NOPV and its remaining Members.

129.     When Harvey Goodman in his role as CEO of GGG wrongfully and illegally
terminated Plaintiff, knowing that NOPV would gain the right and option to purchase Plaintiff's
NOPV Units, Harvey Goodman in his capacity as an agent for and Manager of NOPV breached
his fiduciary duties of loyalty and reasonable care to Plaintiff as a Member of NOPV.

130.     On or about August 21, 2018, after Defendant GGG terminated Plaintiff, Harvey
Goodman in his capacity as Manager of NOPV sent Plaintiff a letter stating that NOPV was
exercising its right and option to repurchase Plaintiff's NOPV Membership Units as a result of
his termination from GGG.

131.     The letter included a check for $55,845 that, according to the letter, represented
return of Plaintiff's capital contribution plus a small amount of interest.   The letter also stated
that as of August 31, 2018, Plaintiff would no longer "participate in any Net Income, Net Loss or
any distribution of cash or assets of the company."

132.     The $55,845 proffered was far below the actual value of Plaintiff's NOPV
Membership Units.

133.     When Harvey Goodman, in his role as Manager of NOPV, sent the above letter
exercising NOPV's option and right to purchase Plaintiff's NOPV Units, knowing that
Defendant GGG had wrongfully and illegally terminated Plaintiff, he breached his fiduciary
duties of loyalty and reasonable care he owed to Plaintiff.

134.     Harvey Goodman's and NOPV's breach of their fiduciary duties of loyalty and reasonable care to Plaintiff caused direct economic harm to Plaintiff.

135.     Harvey Goodman's and NOPV's breach of their fiduciary duties of loyalty and reasonable care to Plaintiff caused economic gain to NOPV, Harvey Goodman and NOPV's other Members in that they now own or attempted to own Plaintiff's NOPV Units.

**WHEREFORE**, Plaintiff prays this Court for the following relief against Defendants NOPV and Harvey M. Goodman as Manager of NOPV:

1)       Declare that NOPV and Harvey Goodman breached their fiduciary duties of loyalty and reasonable care to Plaintiff.

2)       Declare that NOPV's option and right to purchase Plaintiff's NOPV units is null and void because of NOPV's and Harvey Goodman's breaches of their duties of loyalty and reasonable care to Plaintiff.

3)       Order NOPV and Harvey Goodman, in his capacity as Manager of NOPV, to return Plaintiff's NOPV units to Plaintiff.

Dated:  January 28, 2020

Respectfully submitted,

TOBIN, O'CONNOR & EWING

By:     /s/ David C. Tobin
        David C. Tobin, Esq., Bar No. 03727
        dctobin@tobinoconnor.com
        5335 Wisconsin Avenue, N.W., Suite 700
        Washington, D.C.  20015
        Tel:  (202) 362-5900
        Fax: (202) 362-6579

**DIAZ REUS & TARG, LLP**

By:

        Richard N. Wiedis
        1850 M Street, N.W.
        Suite 600
        Washington, D.C. 20036
        Tel.: 202 684-2334
        rwiedis@diazreus.com
        <u>Motion For Pro Hac Vice</u>
        <u>Admission Pending</u>
        *Attorneys for Plaintiff*

**<u>Jury Demand</u>**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury as to all issues so triable.

TOBIN, O'CONNOR & EWING

By:    /s/ David C. Tobin
        David C. Tobin, Esq., Bar No. 03727
        dctobin@tobinoconnor.com
        5335 Wisconsin Avenue, N.W., Suite 700
        Washington, D.C.  20015
        Tel:  (202) 362-5900
        Fax:  (202) 362-6579